# Exhibit "G"

Not Reported in A.
2000 WL 1227307 (Conn.Super.)
**(Cite as: 2000 WL 1227307 (Conn.Super.))**
H

Page   1

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Connecticut.

BLUE RIDGE INSURANCE COMPANY,
v.
Albert HONEGAN et al.

No. CV 980085273.

Aug. 14, 2000.

MEMORANDUM OF DECISION ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (# 111)

GORDON

V. Factual and Procedural Background

*1 On April 8, 1998, the plaintiff, Blue Ridge Insurance Company, filed a declaratory judgment complaint against the defendants, Albert Honegan and David A. Malcolm, claiming that it has no duty to defend and/or indemnify Malcolm in the underlying action *Albert Honegan v. David A. Malcolm,* Superior Court, judicial district of Middlesex at Middletown, Docket No. CV-97-0084159S ("the underlying action").

The following counts of the underlying complaint dated March 2, 1998 are at issue here: The first count alleging assault; the second count alleging intentional infliction of emotional distress, and the fifth count alleging negligent infliction of emotional distress. The underlying complaint alleges the following: On or about October 23, 1997, Honegan noticed a "Century 21" sign at or near the end of Malcolm's driveway. Honegan drove his car up the driveway and stopped in front of the garage. At this time Honegan observed an adult male exit the garage area and walk in a threatening and hostile and rapid manner towards his car. Honegan became fearful and

attempted to back his car out of the driveway. The aforementioned adult male fired gun shots. The firing of the shots was an intentional physical act by Malcolm. As a result, Honegan sustained great physical and mental suffering and anguish requiring treatment, all to his loss, and some or all of his injuries are, or may be, permanent in nature.

On March 2, 2000, Blue Ridge filed a motion for summary judgment and supporting memorandum of law. Blue Ridge argues that it is entitled to summary judgment on the ground that there is no genuine issue of material fact and it is entitled to judgment as a matter of law because it has no duty to defend and/or indemnify Malcolm. On April 20, 2000, Malcolm filed an objection to the motion for summary judgment on the ground that there is a genuine issue of material fact that Blue Ridge has a duty to defend and/or indemnify Malcolm. On April 26, 2000, Malcolm filed a memorandum in support of his objection to the motion for summary judgment.

For the reasons stated below, Blue Ridge's motion for summary judgment is denied.

II. Standard of Review

"The judgment sought shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Practice Book § 17-49. Summary judgment "is appropriate only if a fair and reasonable person could conclude only one way." *Miller v. United Technologies Corp.,* 233 Conn. 732, 751, 660 A.2d 810 (1995). A material fact is one "which will make a difference in the result of the case." *Barrett v. Southern Connecticut Gas Co.,* 172 Conn. 362, 378, 374 A.2d 1051 (1977). "In deciding on a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party ..." (Internal quotation marks omitted.) *Hertz Corp. v.*

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.




Not Reported in A.                                                    **Page   2**
(Cite as: 2000 WL 1227307, *1 (Conn.Super.))

*Federal Ins. Co.,* 245 Conn. 374, 381, 713 A.2d 820 (1998). "The movant must show that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact ..." (Internal quotation marks omitted.) *Miller v. United Technologies Corp, supra,* 233 Conn. 751-52. "[A] party opposing summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such an issue." *Maffucci v. Royal Park Limited Partnership,* 243 Conn. 552, 554-55, 707 A.2d 15 (1998).

III. Discussion

**\*2** Blue Ridge argues that it is entitled to summary judgment on the ground that there is no genuine issue of material fact and it is entitled to judgment as a matter of law because it has no duty to defend and/or indemnify Malcolm. Specifically, Blue Ridge argues that Honegan has not alleged facts in the underlying action that he sustained damages that arose out of an "occurrence" as defined by Malcolm's homeowner's policy and umbrella policy.

In response, Malcolm argues that there is a genuine issue of material fact that Blue Ridge has a duty to defend and/or indemnify him. He argues that Honegan has alleged facts in the underlying action that he sustained damages that arose out of an "occurrence" as defined by Malcolm's homeowner's policy and umbrella policy.

"The obligation of the insurer to defend does not depend on whether the injured party will successfully maintain a cause of action against the insured but on whether he has, in his complaint, stated facts which bring the injury within the coverage. If an allegation of the complaint falls even possibly within the coverage, then the insurance company must defend the insured." *Moore v. Continental Casualty Co.,* 252 Conn. 405, 409, 746 A.2d 1252 (2000).

The relevant sections of Malcolm's homeowner's liability insurance policy at

issue here, No. 052-92-75, are as follows:

Section II--Liability Coverages, Coverage E--Personal Liability--

If a claim is made or a suit is brought against an "insured" for damages because of "bodily injury" or "property damage" caused by an "occurrence," or because of "personal injury" caused by an offense, to which this coverage applies, we will:
1. pay up to our limit of liability for the damages for which the "insured" is legally liable. Damages include prejudgment interest awarded against the "insured."
2. provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when the amount we pay for damages resulting from the "occurrence" or offense equals our limit of liability.

Definitions--

8. "occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period "Accident" is not defined in the policy.

9. personal injury means injury arising out of one or more of the following offenses which occur during the policy period:
a. false arrest, detention or imprisonment, or malicious prosecution;
b. libel, slander or defamation of character; or

c. invasion of privacy, wrongful eviction or wrongful entry.

The relevant sections of Malcolm's umbrella policy at issue here, No. U0025109, are as follows:

Conditions--

1. Limits of Liability.

We are liable only for your "ultimate net loss" in excess of your "retained limit." Our

Copr. ® 2004 West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.                                                    Page    3
(Cite as: 2000 WL 1227307, *2 (Conn.Super.))

liability for any one "occurrence" will not exceed the amount of liability shown in the Declarations regardless of the number of

**\*3** a. "Insureds" under this policy;
b. Persons or organizations who sustain "personal injury" or "property damage"; or
c. Claims made or suits brought because of "personal injury" or "property damage."

Additional Coverages--

In addition to our limit of liability, we shall provide the following coverage for an "occurrence" which is covered by this insurance ...

Definitions--

5. "Occurrence" means an accident, including exposure to conditions, which results, during the policy period ... "Accident" is not defined in the policy.

"It is the function of the court to construe the provisions of the contract of insurance." *Flint v. Universal Machine Co.,* 238 Conn. 637, 642, 679 A.2d 929 (1996). "An insurance policy is to be interpreted by the same general rules that govern the construction of any written contract and enforced in accordance with the real intent of the parties as expressed in the language employed in the policy." *Schultz v. Hartford Fire Ins. Co.,* 213 Conn. 696, 702, 569 A.2d 1131 (1990). "If ... the words in the policy are plain and unambiguous the established rules for the construction of contracts apply, the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning, and courts cannot indulge in a forced construction ignoring provisions or so distorting them as to accord a meaning other than that evidently intended by the parties." (Internal quotation marks omitted.) *Id.,* 702-03. "If the insurance coverage is defined in terms that are ambiguous, such ambiguity is, in accordance with standard rules of construction, resolved against the insurance company." (Internal quotation marks omitted.) *Id.,* 702. "Where the terms of the policy are of doubtful meaning, the construction most favorable to the insured will be adopted." (Internal

quotation marks omitted.) *Id.*

The threshold issue here is whether Honegan has alleged facts in the underlying action that he sustained damages that arose out of an "occurrence" as defined by Malcolm's homeowner's policy and umbrella policy.

In Malcolm's homeowner's policy and umbrella policy "occurrence" is defined as an "accident." "Accident" is not defined in either of the policies. However, Connecticut courts have discussed the definition of "accident." "Accident" has been defined as "a sudden event or change occurring without intent or volition through carelessness, unawareness, ignorance or a combination of causes and producing an unfortunate result. Webster's Third New International Dictionary of the English Language." *Providence Washington Ins. Group v. Albarello,* 784 F.Sup. 950, 953 (D.Conn.1992). "An accident is an unintended occurrence." *Hammer v. Lumberman's Mutual Casualty Co.,* 214 Conn. 573, 590, 573 A.2d 699 (1990). "The term 'accident' is to be, construed in its ordinary meaning of an 'unexpected happening.' The 'accident' was the event causing injury, not the cause of that event." (Citations omitted.) *Commercial Contractors Corp. v. American Ins. Co.,* 152 Conn. 31, 42, 202 A.2d 498 (1964). The focus is on whether the event causing the injury was accidental, not on whether the injury was accidental because the damages were unintended. *Providence Washington Ins. Group v. Albarello,* 784 F.Supp. 950, 953 (D.Conn.1992).

**\*4** In the underlying complaint, Honegan alleges that Malcolm's acts were intentional. He alleges that the "event causing the injury" was the firing of the gun which was an intentional act. In his Memorandum in Support of Plaintiff's Motion for Summary Judgment, dated February 29, 2000, Blue Ridge references deposition testimony by Malcolm dated January 10, 2000, claiming that the facts demonstrate that the act of firing the gun was an intentional/non-accidental act by Malcolm. Blue Ridge argues that: "He stated that pulling the gun and discharging it was an 'act of protection' (T.19). He fired the gun three or four times in order

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.




'to get the person off my property.' (T.21.) In order to fire the gun he had to go through separate intentional actions of 1) removing the gun from the holster, 2) releasing the safety (as he stated the reason one releases the safety is in order to discharge a bullet. T .24), and 3) firing the gun three or four time[s]. (T.23) [.] The trigger must be pulled for each shot since the gun is not an automatic weapon[.] (T.26.) He considered the individual on his property an 'intruder'; [ (T.28) ]; and used the gun to get him to leave the property. He had no 'other purpose in discharging [his] weapon three or four times [other than] to have the intruder leave [his] property.' [ (T.32-33, 35.) ] Firing the gun had the desired result of forcing Honegan to leave the property. [ (T.33.) ]"

On the other hand, Malcolm claims that his act of firing the gun was an unintentional act, a reaction, an "accident." Therefore, he argues that there is a dispute as to whether the firing of the gun constitutes an "occurrence" as defined by his insurance policies. He argues that this issue raises questions of fact for the jury to decide. In his Memorandum of Law in Support of Objection to Motion for Summary Judgment, dated April 26, 2000, Malcolm references and attaches deposition testimony dated January 10, 2000, provided by himself, in which he denies intentionally firing the weapon. Malcolm argues that his deposition states that: "He admits to firing the handgun. However, '... it happened very quickly, I wasn't thinking about what I was doing ...' (Deposition of David Malcolm, p. 19, 11.10-11, attached hereto as Exhibit C.) '[He] never did anything intentionally.' [Pulling the trigger] 'was a reaction.' (Deposition of David Malcolm, p. 21, attached hereto as Exhibit C.) '[He] never intended to do anything it was a reaction to fear.' (Deposition of David Malcolm, pp. 21-22, attached hereto as Exhibit C.) '... [He] discharged the gun because [he] was scared for the safety of [his] family.' (Deposition of David Malcolm, p. 34, attached hereto as Exhibit C.) He said it happened so fast and that he was 'reacting.' (Deposition of David Malcolm, p. 21 and 38, attached hereto as Exhibit C.)"

"In interpreting our decision in *Esposito v.*

*Wethered,* 4 Conn.App. 641, 496 A.2d 222 (1985), the Superior Court has been split as to whether deposition testimony, either uncertified or certified, may be considered for the purposes of a motion for summary judgment pursuant to Practice Book § 384. Since our decision in Esposito, we have not determined it to be improper for a trial court to consider deposition testimony in ruling on a motion for summary judgment. See *Maffucci v. Royal Park Ltd. Partnership,* 42 Conn.App. 563, 568, 680 A.2d 333, *cert. denied,* 239 Conn. 948, 686 A.2d 125 (1996); *Union Trust Co. v. Jackson,* 42 Conn.App. 413, 420, 679 A.2d 421 (1996); *Battistoni v. Weatherking Products, Inc.,* 41 Conn.App. 555, 560-61, 676 A.2d 890 (1996)." *Schratwieser v. Hartford Casualty Ins. Co.,* 44 Conn.App. 754, 765 n. 1, 692 A.2d 1283, *cert. denied,* 241 Conn. 915, 696 A.2d 340 (1997). The court here will consider the deposition testimony in ruling on this motion for summary judgment.

**\*5** The issue of whether conduct which was alleged would constitute an "occurrence" within the meaning of a specified insurance policy was addressed in both *Assurance Co. of America v. Cabeleiro,* Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 355615 (June 16, 1999) (Skolnick, J.) and *Aetna Casualty & Surety v. Gentile,* Superior Court, judicial district of New Haven at New Haven, Docket No. 353207, 20 CONN.L.RPTR. 17 (June 24, 1997) (Silbert, J.). In both *Assurance Co. of America v. Cabeleiro, supra,* Superior Court, Docket No. 355615, and *Aetna Casualty & Surety v. Gentile, supra,* Superior Court, Docket No. 353207, the courts denied motions for summary on the ground that there is a genuine issue of material fact as to whether the conduct alleged in the underlying complaints constitute an "occurrence" as defined in the policies.

In *Assurance Co. of America v. Cabeleiro, supra,* Superior Court, Docket No. 355615, Assurance Co. of America filed a motion for summary judgment arguing that the acts alleged by the plaintiffs in the underlying action do not constitute an "occurrence" under Cabeleiro's insurance policy because "occurrence" is defined under the policy as an "accident," and

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.                                                                                    **Page  5**
(Cite as: 2000 WL 1227307, *5 (Conn.Super.))

the acts alleged are intentional. In response, Cabeleiro argued that their affidavits raise genuine issues of material fact that they did not act intentionally. *Id.* The court reasoned that, " '[i]ntent is clearly a question of fact that is ordinarily inferred from one's conduct or acts under the circumstances of the particular case ... Thus, whether the actor knows the consequences of his or her conduct are certain or substantially certain to result from his or her act and still proceeds with the conduct, so that he or she should be treated by the law as though he or she in fact desired to produce the result, is a question of fact for the jury.' *Morascini v. Commissioner of Public Safety,* 236 Conn. 781, 809, 675 A.2d, 1340 (1996)." *Id.* " 'A question of intent raises an issue of material fact, which cannot be decided on a motion for summary judgment.' *Suarez v. Dickmont Plastics Corp.,* 229 Conn. 99, 111, 639 A.2d 507 (1994)." *Id.*

Similarly, in *Aetna Casually & Surety v. Gentile, supra,* Superior Court,  Docket No. 353207, 20 CONN.L.RPTR. 17, Aetna Casualty & Surety filed a motion for summary judgment arguing that the acts alleged by the plaintiff in the underlying action do not constitute an "occurrence" under Gentile's insurance policy which defines an "occurrence" as an "accident." *Id.* Aetna argued that the plaintiff in the underlying action sustained injuries as a result of Gentile's affirmative acts, and not as the result of an accident. *Id.* In support of this proposition, Aetna referenced admissions and a statement to the police by the plaintiff in the underlying action. *Id.* In opposition, Gentile argued that the injuries were sustained as the result of an accident. *Id.* The court stated that, " '[s]ummary judgment procedure is particularly inappropriate where the inferences which the parties seek to have drawn deal with questions of motive, intent and subjective feelings and reactions.' *Suarez v. Dickmont Plastics Corp.,* 229 Conn. 99, 111, 639 A.2d 507 (1994)." *Id.* The court reasoned that, "[w]hile the admissions and the statement do establish that [the plaintiff in the underlying action] suffered injuries caused when Gentile stabbed and beat her, this evidence does not conclusively establish Gentile's subjective intentions at the time of the incident." *Id.* "As

it is not this court's duty to resolve such factual disputes in connection with a motion for summary judgment, but merely to determine whether they exist, Aetna has failed to sustain its burden of establishing the nonexistence of a material fact concerning the intentions of Gentile at the time when [the plaintiff in the underlying action] suffered her injuries." *Id.*

**\*6** Likewise, here, questions of intent have been raised which present a genuine issue of material fact as to whether there is an "occurrence" as defined by Malcolm's policies. Blue Ridge references allegations in the underlying complaint and deposition testimony by Malcolm that Malcolm intentionally fired the gun. On the other hand, Malcolm references his deposition testimony where he states that he did not intentionally fire the gun, that it was a reaction, an "accident." Accordingly, there exists a genuine issue of material fact.

In addition, although under Malcolm's homeowner's policy the policy provides for liability coverage "[i]f a claim is made or a suit is brought against an 'insured' for damages because ... of 'personal injury' caused by an offense, to which this coverage applies," Honegan does not allege "an offense, to which this coverage applies," namely "a. false arrest, detention or imprisonment, or malicious prosecution; b. libel, slander or defamation of character; or c. invasion of privacy, wrongful eviction or wrongful entry." With respect to Malcolm's umbrella policy, the policy only provides coverage for an "occurrence." Accordingly, whether facts allege that the underlying suit has been brought against Malcolm for damages Honegan sustained which were caused by an "occurrence" remains the dispositive issue here.

Accordingly, Blue Ridge's motion for summary judgment is denied because there exists a genuine issue of material fact as to whether there was an "occurrence" within the meaning of Malcolm's insurance policies.

IV Conclusion

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.




Not Reported in A.
**(Cite as: 2000 WL 1227307, \*6 (Conn.Super.))**

**Page   6**

For the reasons stated above, Blue Ridge's motion for summary judgment is denied.

It is so ordered.

2000 WL 1227307 (Conn.Super.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.





# Exhibit "H"

1995 WL 871829                                      **Page   1**
1995 WL 871829 (D.Conn.)
**(Cite as: 1995 WL 871829 (D.Conn.))**

Only the Westlaw citation is currently available.

United States District Court, D. Connecticut.

CONTINENTAL CASUALTY COMPANY, Plaintiff,

v.

BANK of SOUTHEASTERN CONNECTICUT, et al., Defendants.

Civ. No. 2:91CV326 (PCD).

June 22, 1995.

James T. Baldwin, Thomas Galvin Cotter, Cotter, Cotter & Sohon, Bridgeport, CT, Kevin A. Coles, Coles, Baldwin & Craft, Westport, CT, for Continental Cas. Co.

Michael P. McGoldrick, Cranmore, Fitzgerald & Meaney, Hartford, CT, Frank J. Szilagyi, Chadwick, Libbey, Szilagyi & Stone, Hartford, CT, for Bank of Southeastern Conn.

Paul M. Guernsey, Stevens, Harris, Guernsey & Connolly, P.C., Niantic, CT, for Denise Bevza.

Patricia Modzelewski, Peck & Tuneski, P.C., New London, CT, for Connecticut Bank & Trust.

Jeffrey R. Godley, Brown, Jacobson, Tillinghast, Lahan & King, Norwich, CT, for Chelsea Groton Savings Bank.

Penny Q. Seaman, Ian E. Bjorkman, Wiggin & Dana, New Haven, CT, Carol A. Fantozzi, Bingham, Dana & Gould, Hartford, CT, for Chicago Title Insurance Company.

Glenn M. Gordon, FitzGerald, Gordon, Chinigo & Leone, P.C., Norwich, CT, for Dime Savings Bank of Norwich.

Raymond L. Baribeault, Jr., S. Joel Suisman, Suisman, Shapiro, Wool, Brennan & Gray P.C., New London, CT, Kevin Michael Dowd, Cranmore, Fitzgerald & Meaney, Hartford, CT, for First New London Sav. & Loan Assn.

Gerald L. Garlick, Linda Clifford Hadley, Krasow, Garlick & Hadley, Hartford, CT, for First New London Sav. & Loan Ass'n and Commonwealth Land Title Ins. Co.

James E. Mattern, Law Offices of James E. Mattern, East Lyme, CT, Michael D. Neubert , Maria A. VanDerLaan, Neubert, Pepe & Monteith, New Haven, CT, for New England Sav. Bank.

Mark E. Block, O'Brien, Shafner, Stuart, Kelly & Morris, P.C., Norwich, CT, for Norwich Savings Society.

Richard P. Renehan, Tinley, Nastri & Renehan, Waterbury, Ct, for Robert Renehan.

Anne R. Hoyt, Kleinman Sklar Kirsch LaVette & Hoyt, Plainfield, CT, for Union Trust Company.

Ellen Sue Elbert, Halloran & Sage, Hartford, CT, for Fleet Bank of Connecticut.

Karla A. Dalley, Leventhal, Krasow & Roos, PC, Hartford, CT, for Commonwealth Land Title Insurance Company.

Eliot B. Gersten, Wendy J. Davies, Gersten & Clifford, Hartford, CT, for Joseph & Stephen Corbett, Thomas Cummins, Daniel & Marci Cunningham, Edward & Phyllis Gada, Hatten, Johannemann, William & Bessie Mountzoures, Nicholas & Sally Orobello, Peatfield, Rice, Shea-Arbosy and Testagrose.

*RULING ON MOTION FOR PARTIAL SUMMARY JUDGMENT AND ORDER GRANTING SUMMARY JUDGMENT TO THE NON-MOVING PARTY*

DORSEY, Chief Judge:

**\*1** Plaintiff moves for summary judgment as to its claim that its 1990-91 insurance policy issued to defendant Zrenda & Hinkle, P.C., is void *ab initio*. For the reasons below, plaintiff's motion is denied, and defendants are granted summary judgment on Count One.

I. *FACTS*

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.




1995 WL 871829                                                    **Page   2**
(Cite as: 1995 WL 871829, *1 (D.Conn.))

Jerome and Joseph Zrenda were the principals of the law firm Zrenda & Hinkle, P.C. Denise Bevza was the firm's only associate. Plaintiff provided professional liability insurance to the firm from July 8, 1985, through July 8, 1991.

Several firm clients have filed a malpractice suit against the Zrendas, alleging breach of contract, negligence, and breach of fiduciary duty. Plaintiff is defending that action.

## II. DISCUSSION

Summary judgment will be granted only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The initial burden is on the moving party to demonstrate that there are no material issues of fact in dispute. *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990). "All reasonable inferences and any ambiguities are drawn in favor of the non-moving party." *Id.*

When litigants disagree as to certain facts, summary judgment can be granted only upon a determination that the factual disputes are not genuine, or that the disputed facts are not material. A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A disputed fact is material if it "might affect the outcome of the suit under the governing law." *Id.*

### A. *Misrepresentation*

Plaintiff claims it is relieved of liability under the policy because Jerome Zrenda misrepresented a fact in answering question 13(a) of the policy application. An insurer who raises the defense of misrepresentation must prove that the insured intentionally misrepresented a material fact. *Rego v. Conn. Ins. Placement Facility,* 219 Conn. 339, 346, 593 A.2d 491, 495 (1991).

### 1. *Material Fact*

When an insurance application becomes part

of the policy, its information is material. *Guariglia v. John Hancock Life Ins. Co.,* 139 Conn. 54, 57, 90 A.2d 162, 163 (1952). In the instant matter, the application states that it will "be the basis of the policy of insurance and deemed incorporated therein...." (Pl.'s Mem., Ex. B.) Thus, Jerome Zrenda's response to question 13(a) is material.

### 2. *Intentional Falsification*

Jerome Zrenda answered "No" to question 13(a) of the application, which inquires: Is any lawyer aware of any professional liability claim made against him in the past year, or any incident, act or omission which might reasonably be expected to be the basis of a claim or suit, arising out of the performance of professional services for others?

Between May 18, 1988, and June 11, 1990, Jerome and Joseph Zrenda had received mortgage loans on several pieces of property. They also represented clients in purchases of property involving mortgage financing and refinancing. One of the Zrendas issued a title insurance policy on each mortgage loan. The loans' security did not have the priority the lender expected because the Zrendas had not paid off prior mortgage obligations. As a result, the Zrendas did not pay over two million dollars to various banks.

**\*2** These acts could reasonably lead to claims by the banks and clients involved. The Zrendas knew the response to question 13(a) was false. Therefore, plaintiff had the right to void the policy with respect to the Zrendas.

Plaintiff contends the policy should also be void with respect to defendant Denise Bevza. In order for a policy to be voidable, the insured must know the representation is false when made. *Middlesex Mut. Assurance Co. v. Walsh,* 218 Conn. 681, 692, 590 A.2d 957, 963 (1991). Bevza had no knowledge of the Zrendas' fraudulent activities or misrepresentation until after the policy was issued. Thus, the policy is not void with respect to Bevza.

### B. *Waiver of Right of Avoidance*

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.




1995 WL 871829
(Cite as: 1995 WL 871829, *2 (D.Conn.))

A false representation does not automatically cancel an insurance policy, but instead gives the insurer a "right of choice" to avoid the policy. *MacKay v. Aetna Life Ins. Co.,* 118 Conn. 538, 547, 173 A. 783, 787 (1934). Waiver of the right to avoid may be implied from the insurer's conduct. *Id.* An insurer waives its right of avoidance by delivering a policy and accepting a premium when it knows facts that would invalidate the policy. *Id.* at 548.

After learning of the misrepresentation, plaintiff offered an extended reporting endorsement to the firm and accepted a $6,670 premium from Bevza. The policy provided for the endorsement pursuant to Conn.Gen.Stat. § 38a-394. By enforcing the provision and accepting a premium for it, plaintiff affirmed the validity of the policy.

Furthermore, plaintiff did not cancel the policy upon learning of the Zrendas' misrepresentation in August 1990. When refusing to renew the policy in July 1991, plaintiff cited reasons of "adverse claim experience" and "suspension." (*See* Def.Cummins' Mem., Ex. E.) "An insurer must state its position clearly and in a timely manner in order to preserve its defenses under the policy." *Heyman Assoc. No. 1 v. Ins. Co. of Penn.,* 8 Conn.L.Rptr. 440, 445 (Conn.Super.Ct.1993) (*quoting* Appleman, *Insurance Law and Practice* § 4694 (1979)). If plaintiff meant to assert its right of avoidance, it failed to do so in a clear and timely manner.

Plaintiff also waived its right of avoidance by: (1) requiring the Zrendas to prepare reports for each claim; (2) requiring the Zrendas to notify plaintiff of all claims and pleadings received; (3) processing all claims received by the Zrendas during the policy period; and (4) settling some claims lodged against the Zrendas. These actions constituted enforcement and fulfillment of policy obligations.

Despite its actions, plaintiff claims it has not waived any rights because it has sent several reservation of rights letters to the Zrendas and Bevza. A reservation of rights letter is not a substitute for a notice of disclaimer. *Hartford*

*Ins. Co. v. County of Nassau,* 389 N.E.2d 1061, 1062 (1979).

Based on the foregoing undisputed facts, plaintiff was not entitled to avoid the policy. When one party has sought summary judgment, the court may grant summary judgment for the opposing party if the case clearly warrants that result. 6 James W. Moore et al., *Moore's Federal Practice* ¶ 56.12 (2d ed. 1995). Defendants are clearly entitled to summary judgment.

III. *CONCLUSION*

*3 Plaintiff's Motion for Partial Summary Judgment (doc. 137) is denied. Defendants are granted summary judgment as to Count One.

SO ORDERED.

1995 WL 871829 (D.Conn.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.




# Exhibit "I"

1999 WL 200700                                                                    **Page    1**
1999 WL 200700 (D.Conn.)
**(Cite as: 1999 WL 200700 (D.Conn.))**

▷

Only the Westlaw citation is currently available.

United States District Court, D. Connecticut.

CLT TELECOMMUNICATIONS CORP.
v.
COLONIAL DATA TECHNOLOGIES CORP., et al.

No. 3:96CV2490 (AHN).

March 21, 1999.

RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

NEVAS, District J.

**\*1** The plaintiff, CLT Telecommunications Corporation ("CLT"), brings this diversity action against the defendants, Colonial Data Technologies Corporation ("Colonial"), Walter M. Fiederowicz ("Fiederowicz"), and John N. Giamalis ("Giamalis"), raising claims for breach of contract, intentional misrepresentation, negligent misrepresentation, and breach of fiduciary duty.

Now pending before the court is the defendants' Motion for Summary Judgment. For the reasons set forth below, the motion [doc. # 46] is GRANTED.

STANDARD OF REVIEW

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the moving party is entitled to judgment as a matter of law. *See* Rule 56(c), Fed.R.Civ.P.; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986). The burden of showing that no material factual dispute exists rests on the party seeking summary judgment. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970). After discovery, if the nonmovant "has failed to make a sufficient showing on an essential element of [its] case

with respect to which [it] has the burden of proof," then summary judgment is appropriate. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

The substantive law governing the case identifies those facts that are material on a motion for summary judgment. *See Anderson,* 477 U.S. at 258. A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." *Miner v. Glens Falls,* 999 F.2d 655, 661 (2d Cir.1993) (citation and internal quotation marks omitted). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir.1992) (citation and internal quotation marks omitted).

In assessing the record to determine whether a genuine dispute as to a material fact exists, the court is required to resolve all ambiguities and draw all inferences in favor of the nonmovant. *See Anderson,* 477 U.S. at 255. Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991).

FACTS

CLT is a Taiwanese corporation and maintains its principal place of business in Mialo-Li City, Taiwan. (*See* Pl.'s Responses to Defs.' First Set of Interrogs. at 1 [hereinafter "Pl.'s Interrogs. Resp."]; Compl. ¶ 1.) CLT is primarily engaged in the business of manufacturing and distributing telecommunications products, including cordless telephones. (*See* Aff. of Phillip Chu ¶ 2 [hereinafter "Chu Aff."].) Phillip Chu ("Chu") was CLT's Executive Director from February 1, 1995, until December 1996. (*See* Pl.'s Interrogs. Resp. at 1.)

**\*2** Colonial is a Delaware corporation with its

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.





1999 WL 200700
(Cite as: 1999 WL 200700, *2 (D.Conn.))

**Page  2**

principal place of business in New Milford, Connecticut. (*See* Compl. ¶ 2.) It is engaged in the telecommunications business and specializes in caller identification technology. (*See* Chu Aff. ¶ 7.) At all times relevant to this action, Giamalis was the Vice President and Chief Financial Officer of Colonial. (*See* Aff. of John N. Giamalis ¶ 2 [hereinafter "Giamalis Aff."].) Fiederowicz, a director of Colonial, was the Chairman of Colonial's Board of Directors from approximately September 1994, until March 1996. (*See* Decl. of Walter M. Fiederowicz ¶ 1 [hereinafter "Fiederowicz Decl."].)

In March 1993, G-Communications, Inc. ("G-Communications") commenced its operations in Irwindale, California. (*See* Dep. of Hans Smarius at 21 [hereinafter "Smarius Dep."].) Hans Smarius ("Smarius") was both the president and a director of G-Communications. (*See id.*)

On October 30, 1994, G-Communications first contacted CLT in order to request production information. (*See* Pl.'s Interrogs. Resp. at 2.) On February 9, 1995, CLT commenced manufacturing cordless telephone units for G-Communications on a purchase order basis. (*See* Pl.'s Interrogs. Resp. at 2; Chu Aff. ¶ 5.) CLT received payment for this first purchase on February 24, 1995. (*See* Pl.'s Interrogs. Resp. at 2.)

In April 1995, because G-Communications was experiencing financial difficulties, it had several discussions with CLT concerning future payment terms. (*See* Dep. of Philip Chu on 3/18/98 at 35 [hereinafter "Chu Dep. 3/13/98"]; Pl.'s Interrogs. Resp. at 2.) It was ultimately decided that G-Communications would utilize a letter of credit as its payment method. (*See* Pl.'s Interrogs. Resp. at 2.) Believing the financing issue was resolved, G-Communications subsequently placed several more purchase orders with CLT. (*See id.*)

On July 12, 1995, however, G-Communications informed CLT that it was experiencing difficulties obtaining a letter of credit. (*See id.* at 3.) On July 21, 1995, Chu met with Smarius and determined that CLT

would issue net sixty day terms to G-Communications provided that a factoring company collected any payments to G-Communications from the third-party purchaser and transferred a percentage of the money collected into a CLT account. (*See* Chu Dep. 3/13/98 at 38-39.) Based on this agreement, on August 1, 1995, CLT shipped products valued at $319,628.80 to G-Communications pursuant to its previous orders. (*See* Defs.' Statement of Material Facts Not in Dispute ¶ 2 [hereinafter "Defs.' Stat."].)

In a letter dated September 6, 1995, Romie K. Sidabras ("Sidabras"), the Executive Vice President of G-Communications, alerted Chu of his plan to induce Colonial to invest money into G-Communications. (*See* Letter from Sidabras to Chu of 9/6/95, at 1.) Before receiving Sidabras's letter, CLT had never heard of Colonial. (*See* Defs.' Stat. ¶ 5.) On several occasions prior to September 6, 1995, G-Communications had also attempted to persuade CLT to invest money into G-Communications. (*See* Pl.'s Statement of Material Facts Not in Dispute ¶ 3 [hereinafter "Pl.'s Stat."]; Chu Dep. 3/13/98 at 103.)

**\*3** On September 12, 1995, Smarius, Chu and Fiederowicz met in Los Angeles, California at the offices of G-Communications. (*See* Chu Dep. 3/13/98 at 95-96; Defs.' Stat. ¶ 6; Fiederowicz Decl. ¶¶ 6, 9.) During this meeting, the parties discussed Colonial's possible investment in G-Communications. (*See* Defs.' Stat. ¶ 6; Chu Dep. 3/13/98 at 97-98.) At this meeting, Chu informed Fiederowicz that CLT had entered into an exclusive marketing agreement with G-Communications and that it would continue to honor that agreement no matter who actually owned G-Communications. (*See* Chu Dep. 3/13/98 at 96, 98.)

In an asset purchase agreement dated November 1, 1995, newly formed G-Tel Corporation ("G-Tel") purchased the assets and liabilities of G-Communications for $100,000. (*See* Giamalis Aff. Ex. 1 at 1-2.) G-Tel incorporated in Delaware and maintained its principal place of business in New Milford, Connecticut. (*See id.* Ex. 1 at 1.) Sidabras was

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.




named the Executive vice-president of G-Tel and Smarius was appointed President. (*See* Chu Aff. ¶ 18.)

In a November 22, 1995 letter, drafted on Colonial letterhead, Fiederowicz invited CLT to invest $150,000 in order to obtain a ten percent equity interest in G-Tel, Colonial's "new subsidiary." (*See* Letter from Fiederowicz to Chu of 11/22/95.) George Tang, the President of CLT, accepted Colonial's offer to participate as an equity investor in G-Tel, (*see* Letter from Tang to Fiederowicz of 11/28/95), and designated Chu to negotiate an investment amount. (*See* Letter from Tang to Giamalis of 11/30/95.) On December 6, 1995, Chu, on behalf of CLT, signed a subscription agreement with G-Tel agreeing to purchase ten percent of G-Tel's issued and outstanding common stock for $100,000. (*See* Giamalis Aff. Ex. 3.)

As a result of CLT's investment, Colonial retained control of ninety percent of G-Tel's common stock. (*See* Smarius Dep. at 203 .) In an agreement signed on December 6, 1995, Colonial also confirmed that, "in its sole discretion," it would make available to G-Tel certain financial support, which may include a line of credit or letters of credit or such other forms of support (the "Credit Support") as [Colonial] may determine for the purpose of pursuing all acquisition and investment opportunities with respect to the development and acquisition of new products by [G-Tel] and the distribution and sale of such new products. So long as the Credit support is not canceled ... such Credit Support shall be available ... in an amount not to exceed $300,000.

(*See* Giamalis Aff. Ex. 2.) Colonial also agreed that it would provide administrative support to G-Tel. (*See* Defs.' Stat. ¶ 13.) Colonial, however, did not assume any existing debts or liabilities of either G-Communications or G-Tel. (*See id.* ¶ 10; Pl.'s Stat. ¶ 10.) Colonial's investment into G-Tel benefitted G-Communications and improved the company's financial prospects. (*See* Defs.' Stat. ¶ 15.)

*4 During the course of its relationship with G-Tel, Colonial provided administrative support, performed G-Tel's bookkeeping, accounting and payroll functions, and paid all G-Tel salary and leasing expenses. (*See* Defs.' Stat. 18.) Colonial also made cash advances to G-Tel for the payment of other G-Tel expenses. (*See id .* ¶ 19.) Notwithstanding Colonial's financial support, G-Tel failed to achieve significant sales revenues and the company never became profitable. (*See id.* ¶¶ 20-21.)

In April 1996, Colonial discovered certain financial improprieties at G-Tel's California location where Sidabras and Smarius were located. (*See* Defs.' Stat. ¶ 22.) On May 4, 1996, Giamalis alerted Chu that Sidabras allegedly misused the G-Tel company credit card for personal items. (*See* Chu Dep. 3/13/98 at 148; Chu Aff. Ex. H.) Giamalis further informed Chu that Smarius had mismanaged Sidabras and that both Smarius and Sidabras should be removed from G-Tel's board of directors. (*See* Chu Dep. 3/13/98 at 148.) After speaking with Chu, Giamalis faxed a proposed consent removing Smarius and Sidabras from their positions on G-Tel's board. (*See* Chu Aff. Ex. H.) Chu signed this document and immediately faxed it back to Giamalis. (*See id.;* Chu Dep. 3/13/98 at 149.)

On May 6, 1996, at the request of Giamalis, Smarius and Sidabras arrived in Connecticut for a meeting at Colonial. (*See* Smarius Dep. at 79, 82, 84.) At this meeting, Smarius received a letter from Giamalis which provided: "You are hereby notified that your employment with G-Tel ... is terminated for cause, effective immediately." (*See* Letter from Giamalis to Smarius of 5/6/96.) Smarius was also served with a state court complaint alleging breach of contract, fraud, negligent misrepresentation, breach of fiduciary duty, and breach of the duty of loyalty. (*See* Chu Aff. Ex. J.)

During the course of the May 6, 1996 meeting, Colonial sold its G-Tel shares back to Smarius for the nominal consideration of $1.00 and received a note from Smarius for $130,000 in outstanding loans made by Colonial to G-Tel. [FN1] (*See* Defs.' Stat. ¶ 24.) Colonial and Smarius also executed mutual releases related to all claims involving G-Tel. (

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.





1999 WL 200700                                        **Page   4**
(Cite as: 1999 WL 200700, *4 (D.Conn.))

*See* Defs.' Mem. of Law in Supp. of Defs .' Mot. for Summ. J. Ex. K [hereinafter "Defs.' Mem.].) Finally, Colonial agreed to pay, and did pay, all G-Tel salaries for an additional ninety days. (*See* Defs.' Stat. ¶ 26; Pl.'s Stat. ¶ 26.) Smarius subsequently decided to close down G-Tel. (*See* Defs.' Stat. ¶ 29; Pl.'s Stat. ¶ 29.)

> FN1. Colonial never received payment on this note and has since written it off in its entirety. (*See* Defs.' Stat. ¶ 25.)

On June 10, 1996, CLT commenced this action in the Central District of California. It was subsequently transferred to the District of Connecticut on November 18, 1996.

### DISCUSSION
I. *Count One--Breach of Contract*

In Count One of the complaint, CLT contends that it invested $100,000 into G-Tel as a result of Colonial's oral representation that it would both manage G-Tel and provide the company with the necessary financial support to fulfill G-Tel's business plan. CLT contends that Colonial breached this oral agreement when Colonial sold back its shares in G-Tel to Smarius and stopped financing G-Tel.

**\*5** "A contract is formed when there is an offer and acceptance based on a mutual understanding between the parties." *L.G. Defelice, Inc. v. Fireman's Ins. Co.,* No. 3:97cv18(PCD), 1998 WL 910167, at *4 (D.Conn. Sept. 21, 1998) (citation omitted). Under Connecticut law, in order for a contract to be enforceable the agreement " 'must be definite and certain as to its terms and requirements." ' *Dunham v. Dunham,* 204 Conn. 303, 313 (1987) (quoting *Augeri v. C.F. Wooding Co.,* 173 Conn. 426, 429-30 (1977)), *overruled on other grounds by Santopietro v. New Haven,* 239 Conn. 207 (1996). This requirement is not unique to Connecticut contract law. In fact, when interpreting New York law, the Second Circuit has recognized "that, before the power of law can be invoked to enforce a promise, it must be sufficiently certain and specific so that what was promised can be ascertained .... Thus, definiteness as to material matters is of

the very essence in contract law." *Ohanian v. Avis Rent A Car Sys., Inc.,* 779 F.2d 101, 109 (2d Cir.1985) (citation and internal quotation marks omitted). Where the essential terms of an agreement are either unclear or omitted, the contract must fail because judicial interpretation of the contract is not possible. *See Brookhaven Hous. Coalition v. Solomon,* 583 F.2d 584, 593 (2d Cir.1978); *see also L.G. Defelice, Inc.,* 1998 WL 910167, at *11 n. 15 (recognizing that "terms are reasonably certain when they provide a basis for determining the existence of a breach and giving the appropriate remedy") (citation omitted).

Here, Chu contends that on September 12, 1995, Fiederowicz stated that "if the deal goes through [Colonial] will provide necessary capital and credit so that G-Tel can act like a normal company." [FN2] (Chu Dep. 3/13/98 at 164.) CLT further asserts that Colonial agreed to "manage" G-Tel. (*See id.* at 162.) Colonial argues that these alleged statements are insufficient to give rise to an oral contract. The court agrees.

> FN2. Chu's affidavit submitted in opposition to the defendants' motion for summary judgment contradicts his deposition testimony in that his affidavit represents that Colonial agreed to provide *all* capital and credit necessary for G-Tel to fulfill its business plan. (*See* Chu Aff. ¶¶ 8, 17) (emphasis added). The Second Circuit has recognized that "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. New York City Dep't of Corrections,* 84 F.3d 614, 619 (2d Cir.1996). Thus, to the extent that Chu's affidavit contradicts his deposition testimony, the latter must be accepted.

Even assuming that Fiederowicz made these statements to Chu, these comments are too indefinite to establish an agreement between Colonial and CLT. During his deposition, Chu conceded that no understanding was reached between Colonial and CLT concerning either the amount of support Colonial was obligated to provide or the length of time such support must be maintained. His testimony provides,

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.




1999 WL 200700
(Cite as: 1999 WL 200700, *5 (D.Conn.))

Page 5

in pertinent part:
 Q[:] Okay. Did Mr. Fiederowicz or Mr.
 Giamalis tell you how long Colonial would
 provide capital and credit to G-tel?
 A[:] No, not how long, not how much.

(Chu Dep. 3/13/98 at 165.) Both of these terms
are essential to this agreement and Chu's
admission undermines CLT's breach of
contract claim. *See Myers v. Bunker Ramo Corp.,*
Civ. No. B-90-506(JAC), 1992 WL 88166, at *3
(D.Conn. Jan. 21, 1992) (finding no oral
employment contract where the conversations
between the plaintiff and the defendant
demonstrated that "there was no actual
agreement on any terms"), *aff'd,* 979 F.2d 846
(2d Cir.1992). Chu also admits that the parties
did not have an understanding about what
actions Colonial was obligated to take in order
to "manage" G-Tel. (*See* Chu Dep. 3/13/98 at
163.) Given Chu's testimony, the record is
devoid of any evidence that the parties
actually discussed or agreed upon any of the
terms of this alleged oral contract.
Furthermore, CLT presents no evidence that
Colonial invited them to invest in G-Tel on
September 12, 1995. Without such a showing,
the court cannot find that an offer was even
made to CLT at the time Fiederowicz
allegedly made these statements to Chu.
Therefore, summary judgment is warranted on
this claim. [FN3]

   FN3. Chu's affidavit also provides that "[i]n phone
   conversations with Mr. Giamalis after CLT's
   purchase of the stock, Mr. Giamalis again reiterated
   to me that Colonial Data would provide all the
   capital and credit necessary for G-Tel to fulfill its
   business plan." (Chu.Aff.¶ 17.) It is well established
   that an executory promise is unenforceable in the
   absence of consideration. *See Gianetti v. Norwalk
   Hosp.,* 211 Conn. 51, 61 (1989), *State Nat'l Bank v.
   Dick,* 164 Conn. 523, 529 (1973); *Osborne v. Locke
   Steel Chain Co.,* 153 Conn. 527, 531 (1966).
   "Consideration consists of a benefit to the party
   promising, or a loss or detriment to the party to
   whom the promise is made." *Gianetti,* 211 Conn. at
   61. Given that CLT had already invested in G-Tel at
   this point in time, this alleged promise lacks
   consideration. Thus, this statement does not provide
   a basis for CLT's breach of contract claim.

II. *Counts Two and Three--Intentional and
Negligent Misrepresentation* [FN4]

   FN4. The court notes that CLT makes no argument
   in opposition to Colonial's request for summary
   judgment on both Counts Two and Three. Under our
   Local Rules the "[f]ailure to submit a memorandum
   in opposition to a motion may be deemed sufficient
   cause to grant the motion, except where the
   pleadings provide sufficient grounds to deny the
   motion." D. Conn. L. Civ. R. 9(a). CLT's decision
   not to address Colonial's arguments with respect to
   both of these counts provides a valid basis for
   granting summary judgment in favor of the
   defendants as to both of these counts. Although the
   court could properly rely on this basis alone in
   granting summary judgment, the court will address
   the merits of CLT's claims for the purpose of
   completeness.

*6 Counts Two and Three are the only two
claims directed against defendants
Fiederowicz and Giamalis. In Count Two, CLT
contends that it invested in G-Tel in reliance
on the defendants' representations that it was
committed to managing G-Tel and financing
G-Tel's business plan. CLT asserts that when
the defendants made these representations,
they knew them to be false.

In order to state a claim for intentional/
fraudulent misrepresentation, a plaintiff must
establish four essential elements: "(1) that a
false representation was made as a statement
of fact; (2) that it was untrue and known to be
untrue by the party making it; (3) that it was
made to induce the other party to act on it;
and (4) that the latter did so act on it to his
injury." *Miller v. Appleby,* 183 Conn. 51, 54-55
(1981) (citations omitted).

CLT's claim for intentional misrepresentation
fails because there is no evidence in the record
that either Fiederowicz or Giamalis made any
false statements of fact. Chu acknowledged
this fact at his deposition. The relevant
testimony provides:
Q[:] In your view what statements did Mr.
Fiederowicz or Mr. Giamalis make to you
before you agreed to invest that were false?
What did they say that was false?
A[:] That were false or that were never

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.





1999 WL 200700                                                      **Page   6**
(Cite as: 1999 WL 200700, *6 (D.Conn.))

fulfilled?
Q[:] Well, that were not true, at the time they said them that were not true?
A[:] No---
Q[:] Do you think that they lied to you?
A[:] No, I don't think they lied to me. I don't think they lied to me at all. I just think or know that certain promise was not fulfilled at a later date.

(Chu Dep. 3/13/98 at 169.) Given this concession, CLT cannot establish the second element of its intentional misrepresentation claim. *Cf. Murray v. Xerox Corp.,* 811 F.2d 118, 121 (2d Cir.1987) (interpreting New York law and finding that "a failure to perform promises of future acts is not fraud unless there exists an intent not to comply with the promises at the time it is made") (citation omitted). Thus, this claim fails as a matter of law. *See Celotex,* 477 U.S. at 323 (finding that summary judgment is appropriate if the nonmovant "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof").

In Count Three of the complaint, CLT raises a claim for negligent misrepresentation and asserts that the defendants made certain representations although "they had no reasonable grounds for believing the representations to be true." (Compl.¶ 25.) Chu's deposition testimony undercuts the validity of this claim.

A cause of action for negligent misrepresentation under Connecticut law is consistent with the standard articulated by the Restatement (Second) of Torts which provides that:
One who, in the course of his business, profession or employment ... supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating information.

*7 *Williams Ford, Inc. v. Hartford Courant Co.,*

232 Conn. 559, 575 (1995) (quoting Restatement (Second) of Torts § 552 (1977)). Intent need not be demonstrated to make out a cause of action for negligent misrepresentation. *See id.; see also Foy v. Pratt & Whitney Group,* 127 F.3d 229, 233 (2d Cir.1997). Thus, to establish such a claim a plaintiff must demonstrate that (1) the defendant made a misrepresentation; (2) the defendant knew, or reasonably should have known that the statement was untrue; and (3) the plaintiff's reliance on the misrepresentation was both justifiable and detrimental. *See Foy,* 127 F.3d at 233.

Here, Chu admits that neither Fiederowicz's nor Giamalis's statements were false at the time they were made. (*See* Chu Dep. 3/13/98 at 169.) Without such evidence, CLT cannot establish either the first or second element of its negligent misrepresentation claim.

Accordingly, the defendants are entitled to summary judgment on both Counts Two and Three.

III. *Count Four--Breach of Fiduciary Duty*

In Count Four of the complaint, CLT contends that Colonial, as the majority shareholder in G-Tel, owed CLT a fiduciary duty not to use its majority position to benefit itself and harm CLT. CLT argues that Colonial breached this duty when it sold its shares back to Smarius (a) without notice to [CLT], (b) with knowledge of [CLT's] reliance on Colonial's continued involvement in G-Tel; (c) with knowledge that as a result of Colonial's conduct, [CLT] would thereafter hold a minority interest in a company controlled by someone that Colonial believed was guilty of fraud and violations of fiduciary duties; and, (d) with knowledge that without Colonial's promised participation, [CLT's] interest in G-Tel was valueless.

(Compl.¶ 28.) Colonial argues that it is entitled to summary judgment on this claim because it has no fiduciary duty not to sell its shares. Moreover, Colonial contends that, even if a duty existed, there is no evidence that it breached this duty or that CLT suffered

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.




damages from this breach. Because CLT has not presented any evidence that it was damaged by Colonial's actions, the court finds that Colonial is entitled to summary judgment on this claim.

### A. *Choice of Law*

The parties initially dispute which state's law controls CLT's breach of fiduciary duty claim. CLT argues that because G-Tel is a Delaware corporation, the court must apply Delaware law to this issue. However, neither case relied upon by CLT supports this proposition. *See RCM Sec. Fund, Inc. v. Stanton,* 928 F.2d 1318, 1326 (2d Cir.1991) (recognizing only that "[j]udicial review of a corporate decision to bring, not to bring, or to terminate a lawsuit is in turn governed by the business judgment rule, as determined by the law of the state of incorporation"); *Dynamics Corp. v. WHX Corp.,* 967 F.Supp. 59, 64 (D.Conn.1997) (noting that decisions of a corporation's board of directors must be reviewed under the law of the state of incorporation).

**\*8** Colonial correctly contends that the court must follow Connecticut choice of law rules in deciding this question. *See Rogers v. Grimaldi,* 875 F.2d 994, 1002 (2d Cir.1989) (stating that a "federal court sitting in diversity ... must apply the choice of law rules of the forum state") (citation omitted). Because a breach of fiduciary duty claim sounds in tort, *see Meredith v. Rippeto,* Civ. No. B-87-500(WWE), 1991 U.S. Dist. LEXIS 14793, at *7 (D.Conn. Aug. 26, 1991), the choice of law depends on Connecticut's conflict rules for torts.

Connecticut has traditionally followed the doctrine of lex loci delicti which "presumes that the rights and obligations of the parties to a tort action 'vest' at the place of the injury." *O'Connor v. O'Connor,* 201 Conn. 632, 639 (1986) (citation omitted). However, rigid adherence to this doctrine is no longer encouraged where its strict application "frustrates the legitimate expectations of the parties and undermines an important policy of this state." *Id.* at 637. In fact, the Connecticut Supreme Court has stated:

We are, therefore, persuaded that the time has come for the law in this state to abandon categorical allegiance to the doctrine of lex loci delicti in tort actions. Lex loci has lost its theoretical underpinnings. Its formerly broad base of support has suffered erosion. We need not decide today, however, whether to discard lex loci in all its manifestations. It is sufficient for us to consider whether, in the circumstances of the present case, reason and justice require the relaxation of its stringent insistence on determining conflicts of laws solely by reference to the place where a tort occurred.

*Id.* at 648. Thus, the Connecticut Supreme Court has found that where application of lex loci "would produce an arbitrary [or] irrational result," the guidelines of the Restatement Second of Conflict of Laws should be considered. *Id.* at 650; *see also Northern Tankers (Cyprus) Ltd. v. Backstrom,* 934 F.Supp. 33, 38 (D.Conn.1996).

This is not a case where the application of the lex loci doctrine results in either an arbitrary or irrational outcome. Connecticut, not Delaware, has the most relevant contacts to this controversy. In fact, Delaware has no relation to this case beyond the mere fact that G-Tel is a Delaware corporation. Connecticut, on the other hand, is where Colonial's principle place of business is located. More importantly, the meeting where Colonial allegedly breached its fiduciary duty to CLT was held at Colonial's facility in New Milford, Connecticut. Given these factors, neither party should be surprised by the application of Connecticut law. Moreover, CLT makes no showing that the application of Connecticut law interferes with the legitimate expectations of the parties or undermines an important policy of Connecticut. In the absence of such a showing, the court must apply Connecticut law to CLT's breach of fiduciary duty claim.

### B. *The Scope of Colonial's Fiduciary Duty*

**\*9** Generally, "[a] majority shareholder has a fiduciary duty not to misuse his power by promoting his personal interests at the expense of corporate interests." *United States v.*





*Byrum,* 408 U.S. 125, 137 (1972). A violation of such a duty may occur when a majority shareholder sells his stock and transfers his control "where he knows or has reason to know that the purchaser intends to loot or mismanage the corporation or otherwise injure its shareholders." *Treadway Co., Inc. v. Care Corp.,* 638 F.2d 357, 377 n. 38 (2d Cir.1980) (citation omitted); *Banks v. Vito,* 19 Conn.App. 256, 262 (1989) (recognizing that a breach of fiduciary duty occurs "[i]f the controlling majority stockholder seeks to injure the minority stockholder through the means of looting the corporation or so wrecking it that the minority stockholder would get nothing out of his assets") (citation omitted); *accord Harris v. Carter,* 582 A .2d 222, 235 (Del. Ch.1990) (finding that "while a person who transfers corporate control to another is surely not a surety for his buyer, when the circumstances would alert a reasonably prudent person to a risk that his buyer is dishonest or in some material respect not truthful, a duty devolves upon the seller to make such inquiry as a reasonably prudent person would make, and generally to exercise care so that others who will be affected by his actions should not be injured by wrongful conduct").

CLT claims that Colonial breached its fiduciary duty by selling its controlling interest in G-Tel to Smarius, an individual who Colonial was prepared to file a state court action against sounding in breach of contract, fraud, negligent misrepresentation, breach of fiduciary duty, and breach of the duty of loyalty. (*See* Chu Aff. Ex. J.) While the court questions the appropriateness of such a sale, CLT has presented no evidence that it was injured as a result of this transfer of control. There is no information that Smarius either engaged in self-dealing or mismanaged G-Tel upon gaining control of the corporation. Rather, Smarius decided to close down a business that both parties conceded was never profitable. (*See* Defs.' Stat. ¶ 20.) While such a decision may have put an end to CLT's hopes that G-Tel would eventually become a good investment, it did not alter the present worth of CLT's shares in G-Tel.

There is also no evidence in the record that Colonial benefitted from its sale of its stock to Smarius. *See Byrum,* 408 U.S. at 137 (recognizing that a majority shareholder breaches his fiduciary duty if he uses his ability to control a corporation to his own benefit and to the detriment of the minority shareholder). In fact, it is clear that Colonial lost money. Their ninety percent interest in G-Tel was sold to Smarius for $1.00. Moreover, the $130,000 note Colonial received merely memorialized a preexisting debt owed by G-Tel to Colonial under the Credit Support agreement and Colonial never even received payment of this debt. Finally, the court finds the fact that Smarius and Colonial executed mutual releases from all future claims of limited significance. [FN5]

FN5. CLT also argues that Colonial breached its fiduciary duty by failing to continue to provide financial support to G-Tel. The court rejects CLT's position that a majority shareholder must continue to pour capital into a company that it no longer considers a sound investment. Such a claim is illogical and contradicts the clear language of the Credit Support agreement which allowed Colonial to provide credit to G-Tel in Colonial's sole discretion. Thus, CLT's position is without merit.

**\*10** Accordingly, Colonial is entitled to summary judgment on this claim.

### CONCLUSION

Based on the foregoing analysis, the defendants' Motion for Summary Judgment [doc. # 46] is GRANTED. The Clerk is directed to close this case.

1999 WL 200700 (D.Conn.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.





# Exhibit "J"

Not Reported in A.
1990 WL 283913 (Conn.Super.), 2 Conn. L. Rptr. 297
**(Cite as: 1990 WL 283913 (Conn.Super.))**

**Page   1**

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Connecticut, Judicial
District of Hartford-New Britain, at
Hartford.

The STACKPOLE MOORE TRYON CO.
v.
CAREER PATH, INC.

No. 354111.

July 31, 1990.

*MEMORANDUM OF DECISION ON THE
DEFENDANT'S MOTION TO STRIKE*

HAMMER, Judge.

**\*1** The facts alleged in the plaintiff's
complaint may be stated as follows for the
purpose of the defendant's motion to strike.
The plaintiff retained the defendant to recruit
an individual for employment as its shipping
and receiving manager.   The defendant
agreed to refund its service charge if the
person hired left the job within sixty days
after he started work, provided the service
charge had been paid within fifteen days after
the beginning of his employment with the
plaintiff.

In accordance with the parties' agreement,
the plaintiff hired Duncan Babcock to serve as
its shipping and receiving manager, and he
began work on October 10, 1988.   On October
3rd, Stackpole was told by Career Path that
the charge for its services was $4,085.00, and
that to qualify for its money-back guarantee,
payment had to be received by October 24,
1988.

On October 25th, Career Path informed
Stackpole that the refund would not be given
unless payment was made that day but failed
to pick up Stackpole's check as it had said it
would.    The following day Career Path told
Stackpole to mail the check and stated that it
would still be covered by the guarantee.

On November 3rd, Babcock terminated his
employment and Stackpole requested Career
Path for a refund of its service charge.   Upon
the defendant's refusal to do so the plaintiff
brought this action for breach of the contract.

The defendant has moved to strike the
complaint on the ground that any promise to
extend the date for payment to qualify for the
refund is unenforceable for lack of
consideration.     The plaintiff argues in
opposition to the motion that as a result of
Career Path's promise to extend the time for
payment, Stackpole made the payment
"earlier than it was otherwise obligated to do"
and that its early payment constitutes a
sufficient consideration.

It is a generally accepted rule of contract law
that "a promise to do that which one is
already bound by his contract to do is not a
sufficient consideration to support an
additional promise by the other party to the
contract." *Blakeslee v. Water Commissioners,* 106
Conn. 642 at 652.     For example, an
agreement extending the time for payment of
a loan must be supported by valid
consideration "and requires the debtor to do,
or to promise to do something further than, or
different from, that which he is already bound
to do." *State National Bank v. Dick,* 164 Conn.
523 at 529.

Where the time to pay an interest bearing
debt is extended for a fixed time, the promise
of each is of something detrimental, in that
the creditor agrees to forbear the collection of
his claim, and the debtor gives up his power to
stop the accrual of further interest by the
payment of the principal at maturity. *Williston
on Contracts* (3rd ed.) § 122.   Where there is no
such mutuality of obligation there is no
consideration for the extension of time for
payment.     *Associated East Mortgage Co. v.
Highland Park, Inc.,* 172 Conn. 395, 404.

Under the facts as alleged in the complaint
the plaintiff did not promise to do something
"further than, or different from" what he was
already bound to do, namely, to pay the full
amount of the defendant's bill.   Accordingly,

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.




Not Reported in A.
**(Cite as: 1990 WL 283913, \*1 (Conn.Super.))**

there was no consideration for the promise to extend the time for payment in order to qualify for the refund of the payment under the original agreement. See *Austin Real Estate and Abstract Co. v. Bahn,* 30 S.W. 430 (Tex.1895).

**\*2** The defendant's motion to strike is granted.

1990 WL 283913 (Conn.Super.), 2 Conn. L. Rptr. 297

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.





# Exhibit "K"

1999 WL 464530                                                                    **Page   1**
1999 WL 464530 (D.Conn.)
**(Cite as: 1999 WL 464530 (D.Conn.))**
**H**

Only the Westlaw citation is currently available.

United States District Court, D. Connecticut.

Richard UNDERKOFLER, M.D. Plaintiff
v.
COMMUNITY HEALTH CARE PLAN, INC. Defendant

No. 3:87-CV-534 (EBB).

June 17, 1999.

*RULING ON RENEWED MOTION FOR SUMMARY JUDGMENT*

BURNS, Senior J.

**\*1** The defendant, Community Health Care Plan, Inc. ("CHCP"), brings this renewed motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. The defendant moves for summary judgment on the one remaining count of breach of contract. For the reasons set forth below, the defendant's Motion for Summary Judgment (Doc. No. 414) is GRANTED.

Familiarity is presumed with this Court's twenty-nine page Ruling on Cross Motions for Summary Judgment, filed April 21, 1998 (Doc. No. 386) ["Prior Ruling"], in which the defendant's Motion for Summary Judgment was granted in part and denied in part, and the plaintiff's Motion for Summary Judgment was denied in its entirety.

I. Background

The plaintiff physician, Richard Underkofler, originally filed a motion for summary judgment on June 30, 1997. At that time, the two remaining counts were for breach of contract and discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* The defendant filed its own motion for summary judgment on October 15, 1997.

This Court denied the plaintiff's motion in its entirety. The defendant's motion was granted with respect to the Title VII count, but denied as to the breach of contract count.

In deciding the breach of contract issue, this Court found that "paragraph 11 [of the employment contract] promises the plaintiff that if his professional performance should prove unsatisfactory, the Medical Director and the plaintiff's peers will decide *with him* what course of action is within the best interest of the plaintiff and CHCP." (Emphasis in original) *Prior Ruling* at 15. "It is not clear from [the language of paragraph 11] [FN1] that CHCP retained the prerogative to terminate the plaintiff's employment at will after determining that his performance was not satisfactory. Paragraph 11 could be read as a promise by CHCP to Dr. Underkofler that, at the very least, it would meet with him to explore options that might be mutually agreeable." *Id.* at 15-16. This Court concluded that an ambiguity existed as to what the parties intended to occur if the plaintiff's performance should prove unsatisfactory. *Id.* at 17.

> FN1. Paragraph 11 of the employment contract reads as follows:
> Your performance will be reviewed annually or as necessary by the Medical Director and/or CHCP's Professional Review Committee. In the unlikely instance of unsatisfactory professional performance, the Committee, the Medical Director and your peers will determine with you what course of action is in your best interest and in the best interest of CHCP.

The defendant now moves again for summary judgment on the breach of contract claim. In support of its motion, the defendant raises two arguments. First, that the defendant met its contractual obligations to the plaintiff, and second, that the plaintiff's inability to regain appointment to the Yale-New Haven Hospital's medical staff deprives him of any entitlement to relief. Because this Court agrees with the second argument and finds it dispositive, the defendant's first argument will not be addressed.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



The following facts were found undisputed in this Court's prior ruling and remain undisputed. [FN2] First, pursuant to paragraph one [FN3] of the employment contract, the plaintiff was required to obtain medical staff privileges at Yale-New Haven Hospital in order to fulfill the duties proscribed therein. *Prior Ruling* at 3. Thus, the plaintiff could not perform his contractual obligations to CHCP without these privileges.

> FN2. Although the plaintiff attempts to argue that these facts are in dispute, he has failed, despite his repeated efforts and voluminous submissions to the Court, to produce admissible evidence to the contrary.

> FN3. Paragraph one of the employment contract states:
> You will ... perform other patient-related functions appropriate to your specialty in CHCP affiliated hospitals, ambulatory facilities and birthing centers.

**\*2** Second, on April 10, 1985, the plaintiff met with Dr. Ronald Rozett, CHCP's Medical Director, Dr. Warren Weiswasser, the Medical Director of the clinical department of CHCP's facility at Longwharf, and Dr. Roslyn Chosak (OB/GYN department chief). Rozett informed the plaintiff that his employment contract would not be renewed. *Id.* at 9. The defendant had determined that the plaintiff's professional performance was unsatisfactory. There were a number of reasons the defendant elected not to renew the plaintiff's contract. *Id.* at 20.

Third, the plaintiff would not have achieved reappointment to the medical staff at Yale-New Haven Hospital. *Id.* at 21. The unrefuted evidence shows that the following two statements were made to the plaintiff at a June 5, 1985 meeting with the Hospital's Chief of Staff. Dr. Frederick Naftolin, Chairman of the Department of Obstetrics and Gynecology at Yale University School of Medicine, stated: "I would in conscience not be able to risk having you reappointed by me ... I don't want you to feel like you're somehow caught in some Catch 22 and if you were to now go and try to renegotiate with CHCP, somehow we would come around. We won't."

Pl's Resp. to Def's Req. for Admis. at 10. Dr. John Fenn, Yale-New Haven Hospital's Chief of Staff stated: "I don't see the possibility of your continuing on the staff here almost under any circumstances." *Id.* at 11. Without reappointment, the plaintiff has no privileges at the hospital.

## II. Legal Analysis

### A. The Standard of Review

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue of material fact and that [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 318, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-movant must set forth specific facts showing a genuine issue for trial, however, "mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment." *Cifarelli v. Village of Babylon,* 93 F.3d 47, 51 (2d Cir.1996).

At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In doing so, the court is mandated to resolve "all ambiguities and draw all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir.), *cert. denied,* 506 U.S. 965, 113 S.Ct. 440, 121 L.Ed.2d 359 (1992). Hence, "[o]nly when reasonable minds could not differ as to the import of the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.





1999 WL 464530
(Cite as: 1999 WL 464530, *2 (D.Conn.))

Page 3

evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). *See also Suburban v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir.1992).

B. Discussion

**\*3** In light of the undisputed facts previously mentioned, the defendant contends that the plaintiff is not entitled to relief. The defendant makes two claims in support of this contention. First, because the plaintiff would not be reappointed to Yale-New Haven Hospital, he would lose his privileges there and would then be unable to fulfill his contractual obligations to CHCP. Therefore, once CHCP determined that the plaintiff's professional performance was unsatisfactory, any input he may have had would not have prevented his termination due to the fact that his medical privileges were not going to be renewed. Second, these facts also provided CHCP with a legal basis to terminate the plaintiff's contract, impracticability of performance and frustration of purpose.

On November 1, 1983, the temporary medical staff privileges provisionally granted to the plaintiff at the beginning of his employment expired. *Prior Ruling* at 4. At his deposition, the plaintiff gave the following answer when questioned about his inability to work for CHCP without maintaining medical staff privileges at Yale-New Haven Hospital. "The idea of being a physician for CHCP if you can't work at the hospital is ludicrous." [FN4] Pl's Dep. Aug. 23, 1994 p. 134.

FN4. The following exchange took place at the plaintiff's deposition on August 23, 1994:
Q: Did you consider at that point, when you received Dr. Fenn's letter [dated November 3, 1983, informing the plaintiff of the expiration of his temporary medical staff privileges], that your employment at CHCP might be terminated if you couldn't get those privileges reinstated?
A: I certainly did. The idea of being a physician for CHCP if you can't work at the hospital is ludicrous.
Q: So I mean, this was very serious news to you?
A: Very.
Q: And could well have meant, if you couldn't

reverse what had happened, the end of your employment at CHCP?
A: True.
Q: Did you meet with anybody at CHCP to decide what to do about this?
A: As I recall, Dr. Rozett came down. I believe I met with he and Dr. Chosak. I don't remember if Dr. Weiswasser was involved at that point. I don't remember if Dr. Rozett came down or we went up there, I don't remember if it was his office or our office, but the general feeling was that we would have to make sure that the medical board gave me the privileges; otherwise, I wouldn't be able to stay, obviously.
(Pl's Dep. August 23, 1994 at 133-34).

The defendant argues that, as a result of this Court's prior ruling, the breach of contract claim is now reduced to the proposition that the plaintiff should have been able to provide some input to Rozett as to an alternative to termination prior to Rozett's decision not to renew the plaintiff's contract. The defendant contends, however, that even if the defendant failed to provide the plaintiff with such an opportunity, any such input would not have changed the fact that his privileges were not going to be renewed, resulting in his inability to perform under the contract making termination inevitable.

In Connecticut, the elements of a breach of contract action are: (1) the existence of a contract or agreement; (2) a breach of the contract or agreement; and (3) damages resulting from the breach. *Chem-Tek, Inc. v. General Motors Corp.*, 816 F.Supp. 123 (D.Conn.1993); *O'Hara v. Connecticut*, 218 Conn. 628, 637, 590 A.2d 948 (1991). The plaintiff has the burden to prove each element by a preponderance of the evidence.

There is no dispute over the existence of a contract in this case. The Court will assume, for purposes of resolving this motion for summary judgment only, that the defendant failed to provide the plaintiff with any input prior to deciding not to renew his contract. In light of this assumed breach of contract, the only element for the Court to address is that of damages.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.




1999 WL 464530
(Cite as: 1999 WL 464530, *3 (D.Conn.))

Page   4

In a breach of contract action, the damages award is designed to place the injured party in the same position as he would have been in had the contract been performed. *O'Hara v. Connecticut,* 218 Conn. at 642; *West Haven Sound Development Corp. v. West Haven,* 201 Conn. 305, 319 (1986); 3 Restatement (Second), Contracts, §§ 344(a), 347(a) and (b), and comments contained therein. "The most fundamental precepts of contract law are that a successful plaintiff must show that a breach has occurred, and that as a result, he is not in the same position he would have been had the contract not been breached. The function of a court is to award damages which will fulfill the plaintiff's expectations in the bargain and place him in a position which is as good as possible and which approximates the position he would have been in absent a breach." *Jolie v. Frito-Lay, Inc.,* No. H-86-1418, slip op. at 7 (D.Conn. Feb. 9, 1988).

**\*4** In this case, even if the defendant had provided the plaintiff with some input prior to its determination not to renew his contract, the fact remains that the plaintiff's medical staff privileges at Yale-New Haven Hospital would not have been renewed. Because the contract required the plaintiff to maintain privileges at Yale-New Haven Hospital, he could not satisfy his contractual obligations to CHCP without these privileges. Furthermore, the plaintiff has failed to offer any evidence indicating what input he was prevented from providing which would have altered the defendant's decision.

This Court concludes that the plaintiff has failed to produce any evidence showing that he has suffered damages due to the defendant's breach, and, therefore, no genuine issue of material fact exists. The plaintiff is in precisely the same position he would have been in had the defendant allowed him to offer input as apparently provided in the contract. There is no evidence indicating that the action of the defendant placed the plaintiff in a position different than he would have been in had the action not taken place.

"Even though the failure of the defendants to do the work might be considered a technical breach of the contract, the plaintiff has suffered no actual damage, and no injustice was done to him when he was denied recovery on this aspect of the case." *Waicunas v. Macari,* 151 Conn. 134, 139, 193 A.2d 709 (1963). Although the defendant's action could be termed a technical breach, the plaintiff was not harmed by it. Again, the plaintiff's inability to renew his privileges at Yale-New Haven Hospital prevented him from fulfilling the contractual obligations of his employment contract. As the plaintiff himself acknowledged, it would be "ludicrous" to think of being a physician at CHCP without having privileges at Yale-New Haven Hospital.

The defendant also contends that the plaintiff's inability to renew his privileges provided a legal basis to terminate the plaintiff's contract. Specifically, the defendant relies on the doctrines of impracticability of performance and frustration of purpose.

"The impracticability doctrine represents an exception to the accepted maxim of *pacta sunt servanda,* in recognition of the fact that certain conditions cannot be met because of unforseen occurrences. Cf. *Aetna Casualty & Surety Co. v. Murphy,* 206 Conn. 409, 413, 538 A.2d 219 (1988). A party claiming that a supervening event or contingency has prevented, and thus excused, a promised performance must demonstrate that: (1) the event made the performance impracticable; (2) the nonoccurrence of the event was a basic assumption on which the contract was made; (3) the impracticability resulted without the fault of the party seeking to be excused; and (4) the party has not assumed a greater obligation than the law imposes. 2 Restatement (Second), Contracts s 261; E. Farnsworth, Contracts (1982) § 9.6, p. 678." *O'Hara,* 218 Conn. at 637 (quoting *Dills v. Enfield,* 210 Conn. 705, 717, 557 A.2d 517 (1989)).

**\*5** "A party claiming that a supervening event or contingency has frustrated, and thus excused, a promised performance must demonstrate that: (1) the event substantially frustrated his principal purpose; (2) the nonoccurrence of the event was a basic

Copr. ® 2004 West. No Claim to Orig. U.S. Govt. Works.





1999 WL 464530                                                    Page   5
(Cite as: 1999 WL 464530, *5 (D.Conn.))

assumption on which the contract was made;
(3) the frustration resulted without the fault of
the party seeking to be excused; and (4) the
party has not assumed a greater obligation
than the law imposes. 2 Restatement (Second),
Contracts § 265; E. Farnsworth, Contracts
(1982) § 9.7, p. 691." *Id.* at 638 n. 7.

The defendant argues that each element of
the two doctrines are satisfied in this case.
The Court agrees that the undisputed facts
support this contention.

The plaintiff's inability to retain his medical
staff privileges at Yale-New Haven Hospital
made performance impracticable and
substantially frustrated the defendant's
principal purpose in this case; i.e., employing
an obstetrician/gynecologist to treat CHCP
patients. The nonoccurrence of the event was a
basic assumption on which the contract was
made. In this case, the event was the
plaintiff's inability to maintain privileges at
the hospital. This inability is in no way the
fault of the defendant. Finally, the defendant
has not assumed a greater responsibility than
the law imposes. The plaintiff could no longer
perform and meet his obligations under the
contract.

Therefore, the Court concludes that a
supervening event occurred that made
performance under the contract impracticable
and frustrated its purpose. In light of this, a
legal basis exists to justify the defendant's
decision not to renew the plaintiff's
employment contract. Restatement (Second),
Contracts §§ 261, 265.

Conclusion

For all of the foregoing reasons, the
defendant's Motion for Summary Judgment
(Doc. No. 414) is granted, and judgment shall
enter on the defendant's behalf.

1999 WL 464530 (D.Conn.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



